OPINION
This consolidated appeal comes before this court from the judgment entry of the Lake County Court of Common Pleas, Juvenile Division, awarding permanent custody of appellants' child, B.D. (DOB 8-18-99), to the Lake County Department of Job and *Page 2 
Family Services (LCDJFS). For the reasons discussed below, the judgment of the trial court is reversed and remanded for further proceedings consistent with this opinion.
On September 12, 2005, LCDJFS filed a complaint alleging that B.D. was a dependant and/or neglected child. The complaint alleged that B.D. was living in a home without electricity, without running water, and inadequate food. After discussions with LCDJFS, it was determined the family's problems were a result of Father's and Mother's (appellants) drug usage. On December 9, 2005, a hearing was held during which appellants agreed B.D. was a dependent child. The court subsequently granted LCDJFS protective supervision over the child and placed B.D. in the home of his maternal aunt and uncle.
On March 22, 2006, LCDJFS filed a motion for emergency temporary custody as B.D.'s maternal aunt and uncle determined they were not able to care for him any longer. At that time, Father had been recently released from jail, time he was serving for violating his probation.[1] Moreover, Mother had no contact with LCDJFS or B.D.'s caseworker from February 2, 2006 through March 6, 2006. With no family members available to care for B.D., LCDJFS was awarded temporary custody of B.D. on June 9, 2006.
In June of 2006, LCDJFS developed a case plan for both Mother and Father. The goals of each party's case plan, which will be discussed further infra, were the same. The record indicates Father met most, if not all, of the goals set forth in his case plan during LCDJFS' involvement with B.D. Mother, on the other hand, met some goals but ignored others. *Page 3 
On November 3, 2006, LCDJFS filed a motion for permanent custody. On September 26, 2007, the trial court convened for a hearing on the motion. Upon agreement of the parties, LCDJFS withdrew its motion for permanent custody. Due to the progress he had made in his case plan, Father was subsequently awarded temporary custody of B.D. under the protective supervision of LCDJFS. From October of 2007 through March of 2008, Father and B.D. resided at the home of Kathy Dalton, Father's mother and B.D.'s grandmother.
In late February of 2008, Father was administered a random drug test. On March 2, 2008, the results indicated Father tested positive for cocaine. Due to this relapse, Father had his probation revoked and he was sentenced to a one year term of imprisonment with credit for time served. B.D. remained living with Kathy Dalton, his grandmother, until the end of the school year. However, due to her work schedule, Ms. Dalton was unable to remain B.D.'s full-time caregiver. In June of 2008, LCDJFS again assumed temporary custody of B.D. and the boy was placed in foster care.
In the meantime, Mother had ostensibly removed herself entirely from her son's life. From December of 2007 through late June of 2008, she could not be located and did not visit or communicate with B.D. or any of his case workers. Eventually, on July 2, 2008, mother was arrested for violation of her probation and sentenced to 17 months imprisonment.
On August 8, 2008, LCDJFS filed a second motion for permanent custody of B.D. A hearing on the motion was scheduled for December 10, 2008. Approximately two months prior to the hearing, on October 13, 2008, Father was released from prison. *Page 4 
After his release, Father obtained housing, employment, and had regular visits and phone contact with B.D.
In early November of 2008, in preparation for the hearing, counsel for Father filed a discovery demand, pursuant to the rules of juvenile procedure, requesting production of all materials in LCDJFS' custody relevant to B.D.'s case. The record does not indicate LCDJFS acted on the discovery demand. As a result, Father's counsel served a subpoena duces tecum on LCDJFS requesting its records custodian to produce a complete copy of LCDJFS' file relating to B.D.'s case. In response, LCDJFS filed a motion to quash and a motion for protective order relating to the subpoena. In the midst of these exchanges, counsel for Mother filed a discovery demand seeking essentially the same materials sought by Father through his discovery demand and eventual subpoena. On November 18, 2008, the magistrate ordered LCDJFS to produce the subpoenaed records for an in camera review to determine which, if any, of the records should remain confidential.
On December 5, 2008, five days before the scheduled hearing date, the magistrate completed his review of the records. On that date, he issued a decision granting LCDJFS' motion to quash in part and denying it in part. The trial court purported to adopt the magistrate's decision via interim order on the same date. Via the December 5 entry, appellants' respective counsel were given access to all but fifteen of LCDJFS' records.
The permanent custody hearing commenced on December 10, 2008, as scheduled. Prior to hearing testimony, however, counsel for Mother and Father alerted the court that they only received notice of the magistrate's decision relating to the *Page 5 
production of the records on December 9, 2008, the day before the hearing. Counsel for Mother stated he received the decision at 2:00 p.m. and counsel for Father stated he received it at 5:00 p.m. on that date. To further complicate matters, counsel for appellants pointed out that the records were only available for counsels' review at the Lake County Juvenile Court between the hours of 8:00 a.m. and 4:30 p.m.
On December 9, 2008, counsel for Mother filed objections to the magistrate's December 5, 2008 decision and a motion to continue the permanent custody hearing. In particular, Mother's objections alleged the magistrate erred when he decided to exclude the fifteen referral records from LDCJFS' file. The motion to continue was premised upon the fact that counsel for Mother had not received adequate notice of the availability of the records which were the subject of November 7, 2008 subpoena. As the records were not realistically available for counsel's inspection until hours before the permanent custody hearing was scheduled to begin, counsel asserted he had insufficient time to prepare for the hearing. Counsel for Father joined counsel for Mother in moving for a continuance.
After hearing from counsel for both Mother and Father, as well as counsel for LCDJFS, the trial court made several rulings from the bench. First, the trial court sua sponte declared that it would only consider evidence which had developed since LCDJFS withdrew its previous motion for permanent custody. This meant the trial court limited its consideration of evidence in B.D.'s case from September 26, 2007 through December of 2008. The trial court then denied the motions for continuance. Rather than continue the case, the trial court made the following statement as to how the matter would proceed: *Page 6 
"Here's what we're going to do, we're going to recess right now, we're going to sit down with the documents, we're going to go through the State's outline of their case in chief so that you're going to be able to have an opportunity to reference the documents that are going to be addressed by way of direct examination and produce them for the purposes of preparing your cross. * * *
"* * *
"During the course of the facilitated review of the records, there will be — there will be an exploration of alternative resolutions to the matters in dispute, and the Court will be directive of the pursuit of those options. So we are in recess. We will recommence at 1:15 this afternoon, and we'll have a much better sense of how we're going to proceed as of that time."
At 1:15 p.m., December 10, 2008, the hearing recommenced and the trial court called for opening statements. Prior to appellants' counsel beginning their respective statements, they each objected to the recommencement of the hearing. First, when called to offer his opening statement, counsel for Father had the following exchange with the court:
"[Father's Counsel]: When you said are we ready to go, I wanted to mention that we didn't respond to that.
"THE COURT: You really didn't have a choice.
"[Father's Counsel]: I kind of figured that, but I did want to mention it. It's normally not part of an opening statement, but just for the record purposes, the Court obviously notes the size of the documents that we were trying to examine back in there. I can tell you we were not able to completely review those documents. In fact, most of *Page 7 
them (tape inaudible) single spaced, large amounts of material, and I still don't believe based on that we're able to adequately cross-examine any social workers that were involved in preparing those documents. I just wanted to put that on the record, if we had more time in the case to do that, and then I'll do my opening. So it's on the record, I guess you have to give me more time or say no.
"THE COURT: * * * There isn't going to be a continuance today. * * * I've been around too long and know that 99.9 percent of them are not relevant to the issues that the Court has to consider anyway. Just a lot of recorded documentation of just about everything, which doesn't help or hinder anybody."
After the motion was overruled, Father's counsel made his opening statement. When called to make his opening statement, Mother's counsel leveled the same objection which met with the same outcome. After counsel for the remaining parties gave their opening statements, LCDJFS commenced its case-in-chief. Due to witness availability, testimony was taken out of order.
First to testify for LCDJFS was Christy Himeline, B.D.'s social worker from 2005 through October of 2008. According to Himeline, appellants' case plan was developed in June of 2006. The goals of the case plan were the same for both parties. They were asked to complete a drug and alcohol assessment as well as a mental health assessment and follow any treatment recommendations they were given; further, they were asked to complete parenting classes and demonstrate they were able to provide for the basic needs of B.D. as well as themselves.
Himeline testified, Mother completed parenting classes; however, she did not obtain a mental health assessment and, although she had enrolled in a drug and *Page 8 
alcohol treatment program, she eventually dropped out. Himeline indicated that she lost contact with Mother in December of 2007 through July of 2008. According to Himeline, during this time Mother was totally incommunicado, having no contact with B.D. or LCDJFS. On July 2, 2008, however, Himeline coincidentally encountered Mother at a parade in which Himeline was marching on behalf of LCDJFS. Himeline approached Mother and asked her to call the next day regarding her whereabouts as well as the developments in B.D.'s case. Mother was arrested for a probation violation the same day and sentenced to prison for 17 months. According to Himeline, Mother admitted that, during her near seven month absence, she had made no efforts to obtain drug and alcohol treatment and had not obtained a psychological assessment per her case plan. Mother is scheduled for release from prison in December of 2009.
Himeline testified Mother and B.D. had a bond and were attached to one another. However, Himeline stated B.D. talks much more often about Father than Mother and, significantly, at the time of the hearing, Mother had no contact with B.D. in nearly a year.
With respect to Father's case plan, Himeline testified he sought a psychological assessment in January of 2006. After various interviews, Himeline received a letter from the evaluating psychologist indicating Father required no mental health treatment. Father also successfully completed parenting classes as well as alcohol and drug treatment, which included an inpatient and outpatient program, daily AA and NA meetings and random drug screens. As a result of his progress vis-à-vis his case plan, Father was awarded temporary custody of B.D. in October of 2007.
During this time, Father and B.D. resided with the child's paternal grandmother, Kathy Dalton. Dalton's testimony indicated that while Father had temporary custody of *Page 9 
B.D., Father maintained employment, paid all B.D.'s expenses, including rent, and was B.D.'s primary caregiver. Father helped B.D. with his homework, cooked his dinner, watched television with him, and read to him. Father also participated in school programs with B.D., attended parent-teacher conferences, and went on several field trips with B.D.'s class. While in Father's temporary custody, B.D. was doing well in school, receiving "As and Bs" and Himeline had no concerns about B.D.'s well-being. Himeline testified that B.D. and Father are very bonded and attached to each other and their interactions are "very appropriate."
Next to testify was Jennifer Mix, B.D.'s current social worker. Mix was appointed to the case on October 20, 2008, seven days after father's release from prison. Mix testified that since she became involved in the case, Mother was not involved with a case plan due to her incarceration. Mix did indicate, however, Mother was aware of voluntary programs in which she could participate while incarcerated to help her ultimate cause upon release.
Since Father's release, Mix testified he had obtained employment and lives in an apartment with two adult male roommates. Mix testified she had not requested Father to take a drug screen since his release because her interactions with him have not caused her concern about potential drug use. Mix pointed out that Father is no longer on probation and the only thing remaining on his case plan is a drug and alcohol assessment which, at the time of the hearing, he was attempting to coordinate with his work schedule.
According to Mix, since his release in October of 2008, Father has had regular visitations with B.D. The great balance of his visitations occurred during Kathy Dalton's *Page 10 
unsupervised visitations which take place from 11:00 a.m. to 8:00 p.m. every other Sunday.[2] Testimony indicated that Father was present for all of Kathy Dalton's visits and remained with B.D. the entire time he was visiting Ms. Dalton. B.D. was also permitted by his foster family to have telephone contact with Father of which B.D. took regular advantage.
On cross-examination, questions were posed to Mix whether LCDJFS considered a planned permanent living arrangement (PPLA) in lieu of a motion for permanent custody.[3] Mix responded in the negative. When asked why LCDJFS had not considered such an option, she stated it was: "[d]ue to his young age, it's not common in our agency to file PPLA. His need for permanency weighs more importantly than the PPLA, which is standardly [sic] in my experience teenage children that are unable to be adopted or having a hard time with situations like that."
Also testifying for the state was Jack Brian Kern, B.D.'s outpatient therapist. Kern's therapeutic goal was to help B.D. in expressing his feelings. At the time of the *Page 11 
hearing, Kern had been working with B.D. for nearly fourteen months. During this time, Kern testified it was apparent that B.D.'s relationship with his father was very important to him. Although a generally quiet child, he had expressed worries about never seeing his family again. Kern testified that B.D. enjoyed living with his foster family, "but, on the other hand, they're not mom and dad."
Amy Freeman, B.D.'s guardian ad litem, was called to testify on behalf of B.D. Freeman pointed out that B.D. talks about Father all the time and "idolizes" Father. She stated they have a very close, affectionate relationship and, in her view, Father's involvement in B.D.'s life is "necessary." Although B.D. is doing well in his current foster placement, Freeman testified that B.D. regularly expresses a "need" to see and speak with Father. B.D. has also expressed his desire to live with Father.[4] As an example of the bond B.D. has with Father, Freeman testified that B.D. was up late the night before the permanent custody hearing crying due to his worry that he would never see Father again.
Freeman testified to her belief that B.D. needed legally secure permanent placement. However, she repeatedly testified that the best way to achieve this goal would be through a PPLA rather than granting permanent custody to LCDJFS. In Freeman's view, a PPLA would offer the best available custodial arrangement for B.D. because he could remain with his current foster family without legally severing the profound bond he shares with Father. Throughout her testimony Freeman reiterated the necessity of keeping Father involved in B.D.'s life as well as her belief that a PPLA *Page 12 
would be the best available solution to the issue of B.D.'s custody. During her testimony, Freeman did not discuss B.D.'s association with Mother.
LCDJFS next called B.D.'s foster mother, Anna Lucha, to testify. Lucha testified that B.D. came to live with her family on June 6, 2008. She stated that B.D. has fit well into her family and her 16 year old daughter adores him. Lucha testified that B.D. loves Father very much and that B.D. has indicated the worst scenario for him would be never seeing Father again. Lucha testified that B.D. regularly communicates his interest in returning to live with Father and she testified that B.D. may call Father on the phone whenever he wishes.
Lucha testified that if LCDJFS were given permanent custody of B.D., she and her husband would be interested in adopting B.D. Lucha further indicated that, if adoption occurred, she would be open to permitting B.D. to see Father "as long as there [were] boundaries."
On cross-examination, counsel for Father brought up the option of a PPLA. When the possibility of a PPLA was posed to Lucha, she stated "it sounded like a great idea with everyone involved. It would guarantee [B.D] seeing his family. Honestly, I'm all for that." However, the line of questioning related to the PPLA was truncated upon objection by LCDJFS. After the objection was leveled, the court stated:
"In terms of this particular case today, I want you to understand that the Court does not have the authority to order the planned parent — planned permanent living arrangement in this case because it wasn't asked for. The only thing that the Court can decide today is whether or not permanent custody is going to be granted. That's the only issue." *Page 13 
The possibility of a PPLA or any details surrounding the possibility of a PPLA was not again broached by any party. However, after the close of evidence, counsel for Father made the following proffer:
"* * * had I been allowed to continue to cross-examine Anna Lucha, which was our last witness, the foster mother, about the planned permanent living arrangement, I believe the evidence would have shown, had she been permitted to answer some of the questions I asked, that she did talk with the guardian ad litem about that and the substance or the basis of the planned permanent living arrangement were explained to her by the guardian ad litem and that after the substance of that was explained to her, that she did indicate that she would be in agreement with that sort of an arrangement and would actually want that for Brandon. And I believe I was precluded from questioning the witnesses, or that particular witness about that."
Lastly, Freeman testified on her own behalf and provided a narrative of her recommendation regarding permanent custody. While Freeman underscored that it would not be in B.D.'s best interests to legally terminate his relationship with Father, she acknowledged it was not in her power to compel LCDJFS to move the court for a PPLA in lieu of permanent custody. In light of this, as well as her belief that B.D. required permanency, Freeman recommended LCDJFS be granted permanent custody. It is worth noting that Freeman's final recommendation stood in conflict with her final statement relating B.D.'s best interests. Specifically, Freeman recognized that after permanent custody was awarded, the court could not force LCDJFS to allow B.D. to have contact with Father. However, she concluded her recommendation by stating *Page 14 
B.D.'s best interests would be served by allowing him to have continued contact with Father.
After the close of evidence, Mother's and Father's respective counsel, as well as B.D.'s counsel, moved to dismiss LCDJFS' motion for permanent custody for failure to provide adequate evidence to meet the statutory test for granting permanent custody. The court overruled the motions and, after a short recess, the trial judge rendered his decision from the bench awarding LCDJFS permanent custody. The judgment entry was formally filed with the court on December 12, 2008. Appellants now appeal from that judgment.
Appellants each assert five assignments of error in support of their appeals. For ease of discussion we shall address appellants' assigned errors together as the substance of their arguments on each of their respective assignments of error mirror one another.
For her first assignment of error, Mother alleges:
"The trial court erred and violated appellant's due process rights when it denied the motion to continue the permanent custody hearing and failed to provide defense counsel with adequate time to review records."
Father's first assignment of error similarly contends:
"The trial court erred and abused its discretion by denying Father due process in the termination of his fundamental right to the custody of his son when it denied trial counsels' motion for continuance based on the last minute availability of necessary records from the Department and proceeded with the permanent custody hearing." *Page 15 
Juv. R. 23 states that: "[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties." An appellate court will not reverse a trial court's decision denying a motion for continuance unless the trial court abuses its discretion. In reKangas, 11th Dist. No. 2006-A-0010, 2006-Ohio-3433, at ¶ 24. An abuse of discretion indicates more than an error of law or judgment; rather, a court abuses its discretion when its judgment can be characterized as unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219.
In considering whether a trial court abused its discretion in denying a motion for continuance, a reviewing court considers the length of the requested delay, prior continuances requested and received, the presence or absence of legitimate reasons for the requested delay, appellant's participation or contribution to the circumstances giving rise to the request for a continuance, and any other relevant factors. State v.Unger (1981), 67 Ohio St.2d 65, 67-68. While these factors provide basic guidance, we are mindful that "`[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.'" Unger, supra, at 67, quoting Ungar v.Sarafite (1964), 376 U.S. 575, 589.
The relevant factual and procedural background which led to the court's denial of counsels' motions for continuance is as follows: On November 3, 2008, pursuant to Juv. R. 24, counsel for Father filed a discovery demand seeking production of all relevant materials in LCDJFS' custody relating to B.D.'s case. Evidently, LCDJFS did not respond because on November 7, 2008, Father's counsel served LCDJFS with a *Page 16 
subpoena "commanding" its records custodian to appear in the Lake County Juvenile Court with a complete copy of LCDJFS' file relating to B.D. In response, LCDJFS filed a motion to quash and a motion for protective order relating to the subpoena. In the meantime, counsel for Mother filed a discovery demand relating to the materials which were the subject of the subpoena. Due to the contentiousness of the discovery process, the magistrate ultimately ordered LCDJFS to deliver the subpoenaed records to the court for an in camera review.
On December 5, 2008, after conducting a thorough review of the record, the magistrate filed his decision relating to the subpoena. The decision provided that the records which were deemed available for review and inspection were "necessary and relevant to the pending action, necessary to ensure due process, and their disclosure and the need for disclosure outweighs the confidentiality considerations set forth in the Motion [to quash]." Appellants did not receive notice of the magistrate's decision until December 9, 2008, the day before the permanent custody hearing was scheduled to commence. Mother received notice via mail at 2:00 p.m. on that date and Father, at 5:00 p.m. The notice indicated the records were committed to the custody of the juvenile court; accordingly, the records were only available until that court closed, at 4:30 p.m.
Prior to the commencement of the hearing, the parties moved for a continuance to review the records; but, in lieu of granting the parties' motions, the court recessed for two hours to facilitate a review of all documents relevant to LCDJFS' case-in-chief. After the recess ended, the parties again moved for continuance as they felt they were unable to sufficiently familiarize themselves with the records for purposes of conducting *Page 17 
full and meaningful cross-examinations of LCDJFS' witnesses. The record indicates that out of some 1500 documents, the parties were able to sufficiently review approximately 500.
The trial court again overruled the parties' motions for continuance from the bench, stating:
"First I'll tell you a story. One of the most accomplished criminal defense attorneys in Lucas County years ago physically practiced on the back of an envelope and was quite willing on any day of the week to walk into the courtroom and try a murder case without having ever met his client or looking at any of the State's documents, and did so wonderfully and adequately and very competently.
"There isn't going to be a continuance today. You have two more days to peruse those documents. I've been around too long and know that 99.9 percent of them are not relevant to the issues that the Court has to consider anyway. "Just a lot of recorded documentation of just about everything, which doesn't help or hinder anybody."[5]
With this in mind, LCDJFS asserts the trial court acted within its discretion in denying the motions for continuance primarily because it recessed proceedings to facilitate a review of the documents and materials that would assist appellants' counsel in cross-examining LCDJFS' witnesses. LCDJFS further contends certain other contextual factors militated against a continuance. Namely, LCDJFS and its witnesses were prepared to go forward with trial on the scheduled date; the trial judge was visiting from Lucas County; and, in LCDJFS' view, counsel for appellants were notably at fault *Page 18 
for the position in which they found themselves as they knew the documentary review was pending and did not contact the court prior to December 9, 2008 to confirm its status.
Keeping LCDJFS' points in mind, it is also necessary to underscore that the continuance was sought in a case of significant gravity in which essential rights were being adjudicated and, more importantly, forever affected. Also, from a procedural standpoint, appellants had not previously moved for any continuances and were not seeking a lengthy delay of proceedings. Rather, the motions and the colloquy between the parties and the court indicate appellants' respective trial counsel were merely asking for sufficient time to review all of the documents which, after an in camera review, the magistrate concluded were necessary and relevant in their entirety.
Moreover, regardless of LCDJFS' readiness to go forward and the fact that the judge presiding over the proceedings was a visiting judge, the hearing, according to the judge's ruling, was scheduled to take place over a three day period but concluded in a day and a half. If the hearing was scheduled for three days, LCDJFS, its witnesses, and the judge presumably cleared their schedule for that timeframe. Thus, counsel could have been reasonably granted one of those days to review the documentation.
Further, even though counsel did not contact the court as to the status of the documentary review, counsel for appellants had no realistic opportunities, other than the limited timeframe set aside during the court's recess, to view the record in its entirety. By filing their discovery demands in November of 2008 (which LCDJFS initially ignored then aggressively opposed), counsel for both Mother and Father attempted to secure *Page 19 
sufficient time to review all documents thoroughly. In short, nothing indicates counsels' unfortunate situation was a result of inexcusable neglect or reckless lassitude in their approach to preparing for the final hearing.
Regarding this last point, we believe LCDJFS' bold assertion that counsel for appellants are essentially blameworthy for creating the time crunch of which they now complain is somewhat myopic in light of the circumstances of this case. By claiming that counsel is uniquely culpable for the situation in which they found themselves, LCDJFS conveniently ignores the active role it had in creating the problem. The record reveals counsel for both Mother and Father filed proper discovery demands, pursuant to the Ohio Rules of Juvenile Procedure, relating to the subject documents well before the scheduled hearing date. Rather than producing the records and documents that it could reasonably expect would not be considered confidential, e.g., documents which have nothing to do with referrals, LCDJFS decided to attempt a wholesale block to discovery:
First, LCDJFS simply did not respond and, after a subpoena duces tecum was filed, it attempted to shield all documentary evidence by filing a motion to quash and a motion for protective order. Clearly, if LCDJFS wishes to cry foul as to counsels' failure to contact the court, it must also acknowledge that the gamesmanship in which it engaged played a significant role in compressing the timeframe that counsel had for review of the documents.
Further, following LCDJFS' "logic of fault," it must also be noted that nothing prevented the juvenile court from calling, faxing, or e-mailing counsel to give them definite and prompt notice that the magistrate had rendered his decision and the discoverable documents would be available for counsels' review during the juvenile *Page 20 
court's standard hours of operation. If, as LCDJFS asserts, counsel is somehow blameworthy, it should also recognize the court's role in creating the problem.
With these points in mind, we recognize counsel could have contacted the court regarding the status of the evidentiary review at some point sooner and/or filed a motion for continuance earlier. However, to castigate counsel for not doing so is to ignore many other salient factors which contributed, perhaps more significantly, to the limited time they had to review the documentation. LCDJFS' argument on this aspect of the issue is therefore misleading and fundamentally shortsighted.
As indicated above, continuances in a juvenile proceeding "shall be granted only when imperative to secure fair treatment for the parties." Juv. R. 23. The magistrate's decision allowing discovery of the subject documents established that the materials "are necessary andrelevant to the pending action" and "necessary to ensure dueprocess[.]" (Emphasis added.) Although the record does not indicate the decision was formally adopted by the court, it nevertheless provides a foundation for appellants' position that discovery of (and thus familiarity with) the remaining documents was imperative to the fairness and, perhaps more significantly, the constitutionality, of the proceedings.
Despite the magistrate's point of view on the discoverable material, prior to the commencement of the hearing, the trial court overruled the motions for continuance because, in his view, 99.9 percent of the documents were irrelevant to the issues before the court. However, nothing in the record indicates the trial court conducted a review of the documents, two-thirds of which counsel had insufficient time to review. Because there is no evidence that the trial court actually reviewed the documents themselves, its *Page 21 
ruling regarding the relevance of the documents was unreasonable and thus an abuse of its discretion.
Furthermore, and regardless of the foregoing conclusion, the trial judge pointed out he once knew an attorney who was happy to represent criminal clients with no preparation. This supplementary basis for overruling the motions implies that full and careful preparation for a case is a mere luxury that "accomplished" lawyers do not need. In effect, the trial court's anecdote was a recognition that counsel would be forced to defend their clients with, at best, partial preparation. According to the trial court's express representations, an "accomplished" lawyer would have no difficulty and, in fact, should enjoy this challenge. Such an invitation to (and endorsement of) ineffective representation was clearly unreasonable, if not unconscionable, particularly in light of a parent's well-established constitutional and statutory rights to the effective assistance of counsel in termination proceedings. See R.C. 2151.352; see, also, In reRoque, 11th Dist. No. 2005-T-0138, 2006-Ohio-7007, at ¶ 7. We also hold, therefore, that the trial court's supplementary justification for denying appellants' motion for continuance stands as a separate and independent abuse of discretion.
Although the trial court afforded counsel a limited opportunity to review the documents prior to the hearing, it is undisputed they were only able to review approximately one-third of files at that time. Pursuant to the magistrate's decision, the entirety of the documentation at issue was necessary and relevant to the proceedings and counsels' review of the evidence was sine qua non to satisfy due process. Regardless of these surrounding circumstances, the trial court denied the continuance because it suddenly decided, for reasons unknown and without any review that 99.9 *Page 22 
percent of the evidence was irrelevant and, in any event, counsel should be able to manage appellants' representation ill-prepared.
Parents have a "fundamental liberty interest" in the care, custody, and management of their children, and an "essential" and "basic civil right" to raise them. In re Murray (1990), 52 Ohio St.3d 155, 157; see, also, Stanley v. Illinois (1972), 405 U.S. 645, 651; Santosky v.Kramer (1982), 455 U.S. 745, 753. Moreover, the Supreme Court of Ohio has emphasized that the reasons a trial judge utilizes in denying a continuance deserve particular scrutiny. Unger, supra. In light of the circumstances of this case, we hold the trial court's denial of counsels' motions for continuance acted to unreasonably and arbitrarily deprive appellants' of their ability to fully protect their essential rights. In our view, the requests for continuance were legitimate and reasonable and the trial court abused its discretion in denying the same.
Both Mother's and Father's first assignment of error have merit.
Although our resolution of appellants' first assignments of error is dispositive of the underlying matter, we shall also address appellants' remaining assigned errors in the interest of justice. See, e.g.,Atlantic Mortgage Investment Corp. v. Sayers, 11th Dist. No. 2000-A-0081, 2002-Ohio-844, at ¶ 7.
Mother's second assignment of error alleges:
"The trial court erred when it overruled appellant's objections to the magistrate's decision without conducting an independent review of the decision."
Father asserts for his second assignment of error: *Page 23 
"The trial court committed an error of law when it overruled trial counsel's objections regarding the magistrate's decision, without conducting an independent review of the magistrate's decision pursuant to Ohio Civil Rule 53(D)(4)(d) (2008)."
We first point out that Father improperly focuses his argument on Civ. R. 53. This matter was before the juvenile court and, accordingly, Juv. R. 40 governs the issue assigned as error. This error is not crucial to the substantive argument under consideration, however, because Juv. R. 40(D)(4)(d) mandates the trial court to engage in an independent review of a magistrate's decision. Thus, while the distinction must be drawn, it does not otherwise affect the argument asserted under this assignment of error.
More problematic was Father's failure to file objections to the December 5, 2008 magistrate's decision. This omission operates to waive all but plain error on appeal. Juv. R. 40(D)(3)(b)(iv). The application of a plain error analysis in civil cases is only in the extremely rare case involving exceptional circumstances where error, in which no objection was made, seriously affects the basic fairness, integrity, or public reputation of the judicial process itself. Goldfuss v.Davidson, 79 Ohio St.3d 116, 1997-Ohio-401, at syllabus.
The record indicates that the magistrate completed his review of the subpoenaed records and issued his decision on December 5, 2008. The record also indicates an interim order was entered by the trial court pursuant to Juv. R. 40(D)(4)(e)(ii), which purported to adopt the magistrate's decision after an "independent review" of the matters under consideration. Strangely, however, the interim order adopting the magistrate's decision was not signed by Judge Ray, the judge presiding over the matter *Page 24 
by assignment, but was signed by Judge William W. Weaver, the judge who had recused himself from the case on June 6, 2007. After his recusal, Judge Weaver no longer had authority to act concerning the underlying case. State v. Raypole (Nov. 15, 1999), 12th Dist. No. CA99-05-012,1999 Ohio App. LEXIS 5357, *3; see, also, State ex rel. Stern v. Mascio,81 Ohio St.3d 297, 299, 1998-Ohio-622; Justice v. City of Columbus (Nov. 14, 1991), 10th Dist. No. 91 AP-675, 1991 Ohio App. LEXIS 5488. Because the interim order was signed by a judge who possessed no authority to act on behalf of the court, the order was void ab initio and shall have no bearing on our analysis of the instant issue.
With this in mind, the record reveals that both Mother and Father received their respective copies of the magistrate's decision on the afternoon of December 9, 2008, the day before the commencement of the hearing. After receipt of the decision, only Mother filed objections pursuant to Juv. R. 40(D)(3)(b). The trial court did not immediately rule on the objections. Instead, the court proceeded to an off-record, court-facilitated review of the materials the magistrate found "necessary and relevant to the pending action [and] necessary to ensure due process * * *." After recess, the hearing commenced, over appellants' strenuous objections, and the court took evidence on the issue.
Juv. R. 40(D)(4)(d) indicates a court must rule upon a party's objections to a magistrate's decision after an "independent review as to the objected matters * * *." A review of the record reveals that, after the hearing had concluded, the trial court formally overruled Mother's objections. However, there is nothing in the record to indicate the trial court actually engaged in an independent review of matters which were the subject *Page 25 
of the objections. Specifically, Mother objected to the magistrate's decision to shield fifteen documents from discovery. Even though the trial court recessed for counsel to review the documents the magistrate found discoverable, there is no evidence the fifteen documents that were shielded were reviewed or even available for the trial court's review during the recess.
Juv. R. 40(D)(4)(d) is clear, the trial court is required to conduct an independent review of matters which are the subject to objections to a magistrate's decision. As the trial court did not represent on record that it had engaged in a review of the fifteen excluded documents and there is nothing in the record to indicate such a review took place, we hold the trial court failed to meet its obligation under Juv. R. 40(D)(4)(d). The trial court's failure to follow this established rule indicates it simply failed to entertain Mother's objections altogether. The trial court's acts and/or omissions in this regard are contrary to the mandates of Juv. R. 40(D)(4)(d). Accordingly, Mother's second assignment of error has merit.
However, Father's failure to file objections is fatal to his argument. Father cannot rest his claim of error upon Mother's act of filing objections because nothing in the record indicates the objections were filed on behalf of both parties. As a result, Mother is the only party with standing to challenge the trial court's error. Because the trial court could not err in failing to independently review objections which did not exist, Father's second assignment of error lacks merit.
Next, appellants' third and fourth assignments of error shall be considered together as they share the same theme.
Mother's third and fourth assigned errors state: *Page 26 
"[3.] The trial court erred and abused its discretion when it granted permanent custody to the department against the manifest weight of the evidence.
"[4.] The trial court erred when it failed to discuss each of the factors set forth in R.C. 2151.414(D) in its judgment entry granting permanent custody."
Father's third and fourth assignments of error provide:
"[3.] The trial court abused its discretion when it decided to grant the Department's motion for permanent custody and this decision as against the manifest weight of the evidence.
"[4.] The trial court abused its discretion and committed reversible error when [it] failed to consider all factors set forth in O.R.C. 2151.414(D) as to [B.D.'s] best interest when it granted permanent custody to the Department."
Under these assigned errors, appellants each argue the trial court failed to engage in a legally sufficient statutory analysis in concluding their parental rights should be terminated. They further argue the weight of the evidence militated against awarding LCDJFS permanent custody. As a result of these errors, appellants assert the trial court's judgment should be reversed and remanded.
R.C. 2151.414(B)(1) sets forth the applicable standard for determining the motion for permanent custody. This section provides:
"* * * the court may grant permanent custody of a child to a movant if the court determines * * *, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply: *Page 27 
"(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 [2151.41.3] of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
"(b) The child is abandoned.
"(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
"(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 [2151.41.3] of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state. R.C. 2151.414(B)(1)(a)-(d).
To determine the child's best interest, the trial court must consider all relevant factors set forth under R.C. 2151.414(D)(1). To wit: *Page 28 
"(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 [2151.41.3] of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;
"(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
"(e) Whether any of the factors in divisions (E)(7) to (11)[6] of this section apply in relation to the parents and child." R.C. 2151.414(D)(1)-(5). *Page 29 
R.C. 2151.414(B) establishes a two-pronged test the juvenile court must apply when determining a motion for permanent custody. In practice, the juvenile court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) exists before proceeding to determine the child's best interest. In reFunk, 11th Dist. Nos. 2002-P-0035 and 2002-P-0036, 2002-Ohio-4958, ¶ 36.
Clear and convincing evidence is more than a mere preponderance; it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. We will not reverse an award of permanent *Page 30 
custody to an agency if clear and convincing evidence supports the judgment. Id., at ¶ 39.
Appellants do not dispute B.D. was in the custody of LCDJFS for at least 12 out of 22 months during the pendency of the case. Rather, they contend the trial court erred in concluding that terminating their parental rights was in B.D.'s best interests as it failed to consider all relevant statutory factors and, in any event, the evidence submitted did not support the decision.
With respect to the best interest analysis, "[t]he [trial] court must consider all of the elements in R.C. 2151.414(D) as well as other relevant factors. There is not one element that is given greater weight than the others pursuant to the statute." In re Schaefer,111 Ohio St.3d 498, 505, 2006-Ohio-5513. This court has "consistently held that the provisions of R.C. 2151.414(D) are mandatory and "`"must be scrupulously observed."'" In re Bentley, 11th Dist. No. 2004-A-0075, 2005-Ohio-1257, at ¶ 30, quoting, In re Kelley, 11th Dist. No. 2002-A-0088, 2003-Ohio-194, at ¶ 24, quoting In re Hommes (Dec. 6, 1996), 11th Dist. No. 96-A-0017, 1996 Ohio App. LEXIS 5515, *4; see, also, In reLitz, 11th Dist. No. 2001-G-2367, 2001 Ohio 8903,2001 Ohio App. LEXIS 5061, *14; In re Ranker (Oct. 6, 2000), 11th Dist. No. 99-P-0072,2000 Ohio App. LEXIS 4662, *21. This means the trial court mustdiscuss, in its judgment entry, each of the R.C. 2151.414(D) factors when reaching a determination concerning the best interest of the child and the failure to do so constitutes prejudicial error.Bentley, supra; see, also Kelley, supra, at ¶ 25; Litz, supra, at *14.
In its judgment entry, the trial court explicitly stated it "considered all relevant factors, including those set out by statute." However, the judgment entry merely reflects *Page 31 
the trial court's best interest analysis was premised upon its limited consideration of two of the potentially ten (or more) statutory factors.
In its brief, three-page judgment entry, the court found permanent custody was in the best interest of B.D. for the following reasons:
"1) The child's need for legally secure permanent placement, and whether that type of placement can be achieved without a grant of permanent custody to the Lake County Department of Job and Family Services. [B.D.] very much needs a legally secure permanent placement and this Court finds that parents are unable to take the steps necessary to provide such placement within any reasonable or foreseeable time, and that such placement cannot be obtained without a grant of permanent custody to the Lake County Department of Job and Family Services.
"2) The Court further finds that notwithstanding the child's wishes and Raymond Dalton's obvious affection for [B.D.], when pressure is on Raymond Dalton, he escapes through illegal drug use, contrary to the best interests of his son, [B.D.]"
The first finding demonstrates the court considered R.C. 2151.414(D)(4), i.e., B.D.'s "need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" However, the trial court's finding is essentially a conclusory restatement of the statutory language. It provides little in the way of discussion of why placement cannot be achieved without an award of permanent custody to LCDJFS. The finding does not elucidate why the trial court believed the parents are "unable to take the steps necessary to provide such placement within any reasonable or foreseeable time * * *." This is problematic particularly in light of the evidence of Father's generally sedulous *Page 32 
adherence to his case plan and overall progress he made throughout the case history. Although he had one relapse, it is unclear, without further analysis, why this singular error on Father's behalf should sound the death knell for his custodial relationship with his son. Basically, for the trial court's conclusion to be upheld, more discussion is required to meet the demands of the law as it relates to this aspect of the entry.
The second paragraph demonstrates the court considered R.C. 2151.414(D)(2), i.e., B.D.'s specific wishes. However, the trial court neither considered B.D.'s maturity, he was nine years old at the time of the hearing, nor other important testimony which would provide a relevant context for B.D.'s wishes; namely, the foreseeable impact on B.D.'s emotional and social well-being if the undisputed profound and "necessary" connection between B.D. and Father is legally severed. Instead, the court simply concluded Father "escaped" into drug use whenever he was under pressure and, regardless of B.D.'s articulated wishes, such conduct was not in B.D.'s best interests.
Furthermore, it is beyond cavil that a child's best interests are not served by his or her insertion into an environment where drug use is a primary manner of dealing with problems. However, we point out there was no testimony (or other record evidence) to support the trial court's "diagnosis" that Father suffers from some form of "escapism" (especially when viewed in light of Father's one failed drug test). Father's failed drug test and history of use is important. However, even in light of the severe impact that failed drug test had on Father's custodial future, we cannot discern, without more discussion, how that episode (the only such episode which had occurred since Father was assigned his case plan in June of 2006) simply negates the otherwise significant progress Father has made since his case plan was developed. *Page 33 
These problems notwithstanding, our review of the evidence submitted at the permanent custody hearing demonstrates many more than the foregoing two factors discussed by the court were germane to the case. Even a casual review of the record shows there are multiple other factors under R.C. 2151.414(D) relevant to B.D.'s best interests that the court completely failed to discuss.
In particular, the trial court failed to fully discuss the interaction and interrelation of the child with his "parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." R.C. 2141.414(D)(1). Moreover, although the court drew the undisputed conclusion that B.D. had been in the custody of LCDJFS "for twelve or more months of a consecutive twenty-two month period[,]" it failed to provide any assessment or discussion of the child's custodial history. R.C. 2151.414(D)(3). The trial court further failed to mention and discuss any of the factors under R.C. 2151.414(E)(7)-(11), all of which have some (if not significant) relevance to B.D.'s best interests and whether permanent custody is both reasonable and proper given the evidence before the court.
This court has previously emphasized that "[t]he permanent termination of a person's parental rights is one of the most heart wrenching and difficult decisions that a trial court can make." In re Ethington (July 23, 1999), 11th Dist. No. 98-T-0084, 1999 Ohio App. LEXIS 3419, *7. In rendering factual determinations in cases which address issues of such gravitas, a trial court is required to explain its reasoning so as to permit thorough appellate review. In re Kelley, supra, at ¶ 33; see, also, Ethington, supra. A judgment entry which discusses some, but notall of the factors listed in R.C. 2151.414(D) "must be reversed."Kelley, supra; see, also, Ethington, supra, at *8; In re *Page 34 Brown (1994), 98 Ohio App.3d 337, 343. The mandatory language of the statute implies that all relevant statutory factors necessarily relate to whether a parent should be permanently divested of his or her custodial rights. See In re Alexander (Dec. 19, 1997), 11th Dist. No. 96-T-5510, 1997 Ohio App. LEXIS 5742, at *7. The factors must therefore be given due consideration and carefully discussed in relation to the evidence submitted at the hearing. Without diligent fidelity to these principles, an appellate court cannot fulfill its obligation of conducting a full and meaningful review of the proceedings. Id.
Based upon the foregoing analysis, we hold, the trial court abused its discretion in awarding permanent custody to LCDJFS. This conclusion is a function of the court's failure to fully and specifically discuss all five factors enumerated in R.C. 2151.414(D). The trial court's judgment entry is therefore deficient on its face. Thus, both Mother's and Father's fourth assignment of error has merit.
However, without a proper judgment entry which complies with the law, this court cannot completely address appellants' challenges relating to the weight of the evidence. See Kelley, supra, at ¶ 34, citing In reCongos (Nov. 9, 2000), 11th Dist. No. 2000-L-092,2000 Ohio App. LEXIS 525, *3. In essence, appellate review of a judgment entry which does not comply with the law would be, at best, partial. Under such circumstances, Mother's and Father's third assignment of error is not ripe for consideration.
Finally, Mother's fifth and final assignment of error contends:
"The trial court erred when it refused to allow any evidence or testimony from prior to October 15, 2007."
Father's final assignment of error similarly alleges: *Page 35 
"The trial court abused its discretion when it limited the relevant time period from September 2007 to the present, which excluded consideration of Father's compliance with the case plan, and Brandon's custodial history with Father."
Under their final assignment of error, appellants assert the trial court erred by failing to consider all relevant evidence relating to B.D.'s case history. Specifically, they argue the trial court committed error when it ruled it would only consider evidence collected subsequent to LCDJFS' first motion for permanent custody, a motion which was withdrawn at LCDJFS' request on September 26, 2007.
Before discussing the merits of this argument, we must first provide a context for this issue. The trial court, while in the process of denying appellants' motions for continuance, set forth certain ground rules for the evidence it would be considering; namely:
"[W]e're going to limit the timeframe from the September hearing date and the evidence that has — that is relevant since that hearing date. There were opportunities as of last September for 30 days to file a motion for Notice of Appeal, assuming that that was — no Notice of Appeals were filed by any of the parties. Then the time for appeal of anything that happened before that is gone, and the only — if anything that happens in today's or this case during this hearing, if it gets reviewed by the Court of Appeals, it's going to be reviewed reviewing only those portions which are relevant to the Motion for Permanent Custody as amended."
It is the foregoing limitation on relevant evidence that appellants now challenge.
We begin by pointing out that the "September hearing date" mentioned above refers to September 26, 2007, the date on which LCDJFS' original motion for permanent *Page 36 
custody was scheduled to be heard. The hearing never proceeded to the merits as LCDJFS moved the court to withdraw its motion, which the court granted. However, a review of the trial court's statement indicates it was not considering any evidence prior to the "September hearing date" because all matters submitted prior to that date were, in its view, subject to a final adjudication that was never appealed. Under the trial court's construction, such matters would not bear on the instant motion for permanent custody because they were res judicata and could not be revisited. The trial court's legal conclusion is problematic.
Put plainly, the trial court's granting of LCDJFS' motion to withdraw its motion was not a final appealable order. We need not engage in a barbarous analysis of appellate procedure to draw this conclusion; suffice it to say, R.C. 2505.02(B) does not contemplate a scenario where such a perfunctory decision could be appealed. No hearing was held, no evidence taken, and no substantive dispositional judgment was rendered on September 26, 2007. This case has proceeded under the same case number since its inception and no final dispositional orders have been entered. In essence, the trial court's assertion that anything that occurred prior to September 26, 2007 was "gone" is erroneous.
With this in mind, we hold the trial court should have considered all record evidence relevant to whether permanent custody should or should not be granted. Permitting an artificial temporal designation to define the relevance of evidence in a case of this magnitude is both arbitrary and unreasonable. The trial court was required to consider all evidence relevant to B.D.'s best interests in order to arrive at a truly thorough and reliable outcome. *Page 37 
It is important to point out that neither appellant objected to the trial court's limitation. We must therefore analyze the trial court's decision and determine whether its actions rise to the level of plain error. As discussed under appellants' second assignment of error, an error is plain if it seriously affects the basic fairness, integrity, or public reputation of the judicial process. Goldfuss, supra,
Notwithstanding this lofty standard, we are compelled to hold the trial court committed plain error by failing to consider all relevant evidence related to B.D.'s case history. None of the issues before the court had been formerly and finally adjudicated. As a result, any and all relevant evidence which might inform the court's consideration of the requisite statutory best interest factors should have been considered. Because the termination of parental rights is "the family law equivalent of the death penalty," In re Hayes (1997),79 Ohio St.3d 46, 48, we hold the trial court's limitation on evidence fundamentally and seriously affected the basic fairness, integrity, and public reputation of the proceedings below. See Goldfuss, supra. Accordingly, the matter must be reversed and remanded for a new hearing in which all relevant evidence, i.e., relevant information collected from the date B.D. was adjudicated a dependent child to the date of the final dispositional hearing, is considered.
Both Mother's and Father's fifth assignment of error has merit.
For the reasons discussed in this opinion, Mother's first, second, fourth, and fifth assignments of error have merit. Further, Father's first, fourth, and fifth assignments of error have merit but his second assignment of error is overruled. Finally, given our disposition of Mother's and Father's fourth assignment of error, we hold their third assignments of error are not ripe for review. It is therefore ordered that the judgment of *Page 38 
the Lake County Court of Common Pleas, Juvenile Division, is reversed and the matter remanded for a new trial.
DIANE V. GRENDELL, J., COLLEEN MARY O'TOOLE, J., concur.
[1] The record indicates Father's probation was a result of a previous conviction for possession of crack cocaine. He was found in violation of his probation and sentenced to serve 90 days in jail, from January 20, 2006 through March 16, 2006.
[2] At the hearing, Mix testified that Father was assigned personal visitation days. She pointed out that, since his release from prison, he has had eight opportunities to personally visit B.D. but he has only been able to make three visits. However, the record reveals that Father's inability to make his personal visits was a result of his erratic work schedule. He is employed as a carpet installer and travels frequently. The nature of his job is such that he does not know where he will be working until that morning. Each time he missed his personal visit, his work schedule required him to work late; however, each time he was unable to make a visit, he called and notified LCDJFS ahead of time.
[3] A "planned permanent living arrangement" is defined as a placement that gives legal custody to an agency without terminating parental rights and that allows the agency to make an appropriate placement, including foster care or other placement. R.C. 2151.011(B)(36). Pursuant to R.C. 2151.353(A)(5), a court can order a planned permanent living arrangement "if a public children services agency or private child placing agency requests the court to place the child in a planned permanent living arrangement and if the court finds, by clear and convincing evidence, that a planned permanent living arrangement is in the best interest of the child and that one of the following exists:
"* * *
"(b) The parents of the child have significant physical, mental, or psychological problems and are unable to care for the child because of those problems, adoption is not in the best interest of the child, as determined in accordance with division (D) of section 2151.414 of the Revised Code, and the child retains a significant and positive relationship with a parent or relative.
[4] During the trial court's in camera interview with B.D., the boy made it clear he wished to live with Father and even if this arrangement could not be reached, he emphasized "I want to see my dad no matter what * * *."
[5] It is important to note that, despite the court's statement, counsel for appellants did not have "two more days to peruse those documents." The hearing did not last three days, but only a day and a half. Accordingly, counsel had only the two hour recess to review the record which, as illustrated by the repeated motions for continuance, was insufficient to familiarize themselves with the voluminous materials.
[6] R.C. 2151.414(E)(7)-(11) states:
"(7) The parent has been convicted of or pleaded guilty to one of the following:
"(a) An offense under section 2903.01, 2903.02, or 2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;
"(b) An offense under section 2903.11, 2903.12, or 2903.13 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
"(c) An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;
"(d) An offense under section 2907.02, 2907.03, 2907.04, 2907.05, or2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
"(e) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a) or (d) of this section.
"(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
"(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.
"(10) The parent has abandoned the child.
"(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 [2151.35.3] or 2151.415 [2151.41.5] of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child." *Page 1