[Cite as *In re S.H.*, 2019-Ohio-3575.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

IN RE S.H.                                          :

Minor Child                                         :          No. 108404

[Appeal by V.H., Mother]                            :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 5, 2019

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Court Division
Case No. AD17902987

---

### *Appearances:*

Dean Valore, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Rachel Eisenberg, Assistant Prosecuting Attorney, *for appellee.*

MICHELLE J. SHEEHAN, J.:

{¶ 1} Appellant V.H. ("mother") appeals from a judgment of the juvenile court granting permanent custody of her child S.H. to the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "agency"). After a careful review of the record and applicable law, we affirm the judgment of the juvenile court.

**Substantive Facts and Procedural History**

{¶ 2} In February 2017, S.H., 14 at the time, was removed from mother's home by law enforcement. Three days after the removal, CCDCFS filed a complaint alleging S.H. to be abused due to domestic violence in the home. On June 1, 2017, S.H. was adjudicated abused and neglected. On June 6, 2017, temporary custody was granted to the agency. In its decision granting temporary custody, the trial court noted that mother was refusing to visit the child and disagreed with visits outside the home, and that S.H. did not feel safe in mother's home and did not want to return to the home at the time.

{¶ 3} On January 22, 2018, the agency filed a motion for permanent custody. On June 26, 2018, the trial court held a hearing on the motion, but denied the motion and continued the agency's temporary custody of S.H.

{¶ 4} On August 9, 2018, the agency filed a second motion for permanent custody. On February 27, 2019, the court held a hearing on the motion. At the hearing, the court heard testimony from the assigned social worker in this case, mother, and S.H.'s guardian ad litem ("GAL"). S.H.'s counsel also spoke on her behalf.

**a. Social Worker's Testimony**

{¶ 5} Alia Neal, the social worker in this case, testified regarding S.H.'s custodial history and the agency's efforts in providing services to mother for purposes of reunification. The agency was first involved in February 2017. S.H., 14 at the time, was removed by the police from the home due to a physical altercation

between her and an adult sister who lived in the home. S.H. had marks on her face and her arm from the altercation, and her sister was subsequently charged with domestic violence. Mother was present during the altercation but did not intervene.

{¶ 6} When the social worker was assigned to the case in April 2017, S.H. revealed to her that her half-brothers raped her when she was 13. S.H. also told her therapist later about the rape during an individual therapy session. S.H. did not want to return to the home because of her brothers. Both of them were currently charged with delinquency due to the sexual-assault allegations. One of them still lived in the home at the time of the permanent custody hearing.

{¶ 7} The agency's case plan included a parenting class for mother, family counseling for mother and S.H., and individual counseling for S.H. Mother completed the parenting class, which addressed parent-teen communication skills, and S.H. regularly attended her counseling sessions.

{¶ 8} The agency's efforts to provide family counseling, however, were not successful. Initially, the family therapist was to meet with mother and S.H. in S.H.'s foster home, but the social worker had difficulties scheduling the sessions because of mother's work schedule. When S.H. was placed in another foster home, family therapy in the foster home was not an option, and mother indicated she could not go to the therapist's office due to her work schedule and her lack of transportation.

{¶ 9} The social worker then tried to arrange family therapy in mother's home where all family members would attend. However, while that arrangement was being made, S.H. and mother had a verbal altercation in May 2018, and the two

stopped communicating with each other.  S.H. did not wish to speak to her mother any longer, making in-home therapy impossible to arrange.

{¶ 10} In August 2018, mother and S.H. started speaking with each other again. The social worker tried to refer them to a new family counseling service. However, because of inadequate paperwork prepared by the social worker, the social worker's request was not properly submitted until November 2018.  The service provider declined to provide the in-home therapy, explaining mother had not visited the child sufficiently for the in-home therapy to be effective.  As a final resort, the social worker contacted S.H.'s therapist to explore the possibility of family therapy with her, but the therapist considered it a conflict due to S.H.'s ongoing individual therapy with the therapist.  Consequently, the family counseling prescribed in the case plan never took place over the course of this custody matter.

{¶ 11} Regarding visits between S.H. and her mother, after S.H.'s removal from the home in February 2017, there was one or two visits in March 2017.  From April to August 2017, there were only two or three visits because mother had difficulties identifying dates when she could be available.  These visits had taken place in the foster home.  From November 2017 to January 2018, the foster family arranged for S.H. to have visits in the mother's home.  However, after a January 2018 visit in mother's home, S.H. reported to the social worker that her half-brothers were in the home during the visit and she no longer wanted to have visits in mother's home.

{¶ 12} Consequently, the social worker tried to arrange out-of-home visitation but without success, because mother could not provide dates when she could be available. Then, the incident of verbal altercation in May 2018 between S.H. and mother rendered any further visitations impossible because S.H. no longer wished to speak to her mother. Mother initially did not want to communicate with S.H. either after the altercation, but later indicated she was willing to visit with S.H. in her home provided S.H. was "respectful." S.H., however, was unwilling to have visits either in the home or in the community.

{¶ 13} The social worker testified that S.H. suffers from anxiety, depression, and post-traumatic stress disorder. She had stayed in a Rainbow Babies and Children Hospital's psychiatric unit for having suicidal thoughts and was known to cut herself. S.H. changed foster homes multiple times due to her negative behaviors in these homes, such as stealing from the foster home.

{¶ 14} The social worker had discussed the custody issue with S.H. Because S.H. and her mother had difficulties positively communicating with each other, S.H. did not want her mother involved in her life in any way. The social worker discussed PPLA (Planned Permanent Living Arrangement), an alternative to permanent custody, with S.H. S.H. vacillated between the two options but eventually rejected PPLA, because under that arrangement, mother would still be making decisions about her life. The social worker talked to S.H. to ensure that she understood the consequences of permanent custody. Ultimately, S.H. was steadfast about her choice for permanent custody. In the social worker's assessment, S.H., 16 at the

time of the hearing, had the maturity level of someone her age. The social worker also felt that permanent custody would be the best option for S.H. under the circumstances of this case.

### b. Mother's Testimony

{¶ 15} Mother testified that she has eight children, four of them currently living with her. When S.H. was in her first and second foster homes, they had frequent contact with each other. When she moved to a third foster home, their contact became infrequent.

{¶ 16} Mother acknowledged that when S.H. was 13, she told her about the sexual assault by her half-brothers, but at that time her sons had already left her house and were living with their father. She however acknowledged that one of them was currently living in her home. Under cross-examination by S.H.'s counsel about whether she believed S.H. was raped by her brothers, mother responded that she "kinda do, kinda don't" because S.H. "has been reaching out to" her half-brothers by sending them text messages.

{¶ 17} Mother testified visitation was difficult to arrange because S.H. was "wishy-washy" about visiting with her. Mother stated she was unavailable for out-of-home family therapy because of her work schedule and lack of transportation. She stated she was willing to have S.H. back in the home. When asked about her son facing the rape charge but still living in her home, she responded that she would have him leave the home if she could find a place for him. She acknowledged that

several of her children faced delinquency charges.  She also testified that she is a good mother.

### c.  GAL's Testimony

{¶ 18} S.H.'s GAL filed a report before the permanent custody hearing.  The report noted S.H.'s sister's domestic violence charge stemming from an altercation between the two and S.H.'s half-brothers' pending rape cases in the juvenile court.  The GAL reported that the case-plan objectives were not complete; family counseling failed because of S.H.'s placement disruptions; mother had made minimal progress on her case-plan objectives; and visitations have been rare.  The GAL also reported that S.H. has rejected PPLA because she did not want mother to have any decision-making authority over her.  The GAL recommended that, if PPLA was not an option, permanent custody would be in S.H.'s best interest.

{¶ 19} At the hearing, the GAL testified that S.H.'s behavioral problems worsened since she was in the agency's custody, but the agency was not to be faulted.  The GAL recounted an incident where S.H. stole a cell phone from a foster family and another incident where she was very disrespectful toward the GAL himself during a telephone conversation.  The GAL also noted that S.H. had tried to harm herself on two occasions in December 2018, and once stayed in a psychiatric unit.

{¶ 20} Because of the incidents involving her siblings, the GAL did not think it would be appropriate for S.H. to return to the home.  He reiterated his recommendation for PPLA, but would recommend permanent custody if PPLA was not an option.

{¶ 21} The attorney appointed for S.H. in this custody matter also spoke at the hearing. He stated S.H. did not wish to return to the home because of the sexual assault by her brothers, one of whom remained in the home. Counsel reminded the court that the agency's first motion for permanent custody was denied so that PPLA could be explored as an option for S.H. S.H. subsequently rejected PPLA, prompting the agency to file the second motion for permanent custody.

{¶ 22} After the hearing, the court issued a judgment entry granting permanent custody of S.H. to the CCDCFS. On appeal, mother raises the following assignment of error for our review:

1. The trial court's award of permanent custody and termination of the appellant's parental rights is against the manifest weight of the evidence.

**Standard of Review**

{¶ 23} We begin our analysis by recognizing that "a parent's right to raise a child is an essential and basic civil right." *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). "The permanent termination of parental rights has been described as the family law equivalent of the death penalty in a criminal case," *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14, "All children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation." *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996).

{¶ 24} Under Ohio's permanent custody statute, R.C. 2151.414, the juvenile court's judgment granting permanent custody must be supported by clear and

convincing evidence. Clear and convincing evidence has been defined as "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 25} As for our review, we will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency unless the judgment is not supported by clear and convincing evidence. *See, e.g.*, *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 48; and *In re M.J.*, 8th Dist. Cuyahoga No. 100071, 2013-Ohio-5440, ¶ 24.

**Two-Part Analysis for Permanent Custody**

{¶ 26} R.C. 2151.414 sets forth a two-part analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. R.C. 2151.414(B). Under the statute, the juvenile court is authorized to grant permanent custody of a child to the agency if, after a hearing, the court determines, by clear and convincing evidence, that (1) any of the five factors under R.C. 2151.414(B)(1)(a) to (e) exists, and (2) permanent custody is in the best interest of the child under the factors enumerated in R.C. 2151.414(D).

## The Court's Findings Under the First Prong Are Supported by Clear and Convincing Evidence

{¶ 27} Under the first prong of permanent-custody analysis, the juvenile court is to determine if any of the following factors exists: whether the child has been in the temporary custody of public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period (R.C. 2151.414(B)(1)(d)); whether the child is abandoned (R.C. 2151.414(B)(1)(b)); whether the child is orphaned and there are no relatives of the child who are able to take permanent custody (R.C. 2151.414(B)(1)(c)); whether another child of the parent has been adjudicated as abused, neglected, or dependent on three occasions (R.C. 2151.414(B)(1)(e)); or, when none of these  factors apply, whether "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." (R.C. 2151.414(B)(1)(a)).

{¶ 28} Here, under the first prong of the permanent-custody analysis, the court found two of these five factors present.  First, the trial court noted S.H. has been in the temporary custody of the agency (since June 6, 2017) for 12 or more months of a consecutive 22-month period (R.C. 2151.414(B)(1)(d)).  This finding is reflected by the record.

{¶ 29} Second, the court also found that S.H. cannot be placed with mother within a reasonable time or should not be placed with mother (R.C. 2151.414(B)(1)(a)).  For this finding — regarding the possibility of reunification — R.C. 2151.414 lists 15 factors for the court to consider (R.C. 2151.414(E)(1)-(15)), and

it also permits the court to consider "any other factor the court considers relevant." (R.C. 2151.414(E)(16)). Only one of the enumerated factors under R.C. 2151.414(E) is required to exist for the court to make the finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re Glenn*, 139 Ohio App.3d 105, 113, 742 N.E.2d 1210 (8th Dist.2000). In fact, once the court has properly determined that one of the enumerated factors exist, the court is required to enter a finding that the child cannot or should not be placed with either of his parents within a reasonable period of time. *In re Hauserman*, 8th Dist. Cuyahoga No. 75831, 2000 Ohio App. LEXIS 338, 12 (Feb. 3, 2000).

{¶ 30} Although the trial court only needs to make one finding to support its determination that S.H. cannot be placed with mother within a reasonable time or should not be placed with mother, the court here found four of the enumerated factors present in this case. First, the court found mother failed continuously and repeatedly to substantially remedy the conditions that had caused the removal of S.H. notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents (R.C. 2151.414(E)(1)). For this factor, the court specifically found that the agency made reasonable efforts for unification by including parenting, individual counseling, and family counseling but the services were not completed.

{¶ 31} Second, the court found mother was unwilling to provide food, clothing, shelter, and other necessities for S.H. as evidenced by the unwillingness to successfully complete a case plan so she can properly provide for the child

(R.C. 2151.414(E)(14)). Third, mother has neglected S.H. during the period between the date of the complaint and the date of the motion for permanent custody by her failure to regularly visit, communicate, or support the child (R.C. 2151.414(E)(3)). Fourth, mother has demonstrated a lack of commitment toward S.H. by failing to regularly support, visit, or communicate with S.H. or by her other actions showing an unwillingness to provide an adequate permanent home for S.H. (R.C. 2151.414(E)(4)).

{¶ 32} Our review of the record indicates the trial court's findings are supported by clear and convincing evidence. In its efforts to facilitate unification, the agency prescribed a parenting class to address the parent-child communication issues and family counseling. Although mother completed the parenting class, it did not appear to benefit her, because the communication between her and S.H. actually deteriorated in the course of this permanent custody matter. Although mother is to be commended for completing the parenting class, we note that "[t]he issue is not whether the parent has substantially complied with the case plan, but whether the parent has substantially remedied the *conditions* that caused the child's removal." (Emphasis sic.) *In re McKenzie*, 9th Dist. Wayne No. 95CA0015, 1995 Ohio App. LEXIS 4618, 11 (Oct. 18, 1995).

{¶ 33} The agency also prescribed family counseling. However, the agency's efforts to provide the counseling were hampered by mother's work schedule and her inability to provide transportation for the service, the acrimonious relationship between mother and S.H. and their inability to communicate with each other, and

S.H.'s frequent change of foster placement due to her negative behaviors in the foster home. For the duration of this permanent custody matter, the social worker was not able to schedule any family counseling sessions.

{¶ 34} While the logistical difficulties for mother to be available for the family counseling in locations outside her home is understandable given her work schedule and a lack of transportation options, the social worker testified mother never contacted her on her own or made herself available for the counseling service. Mother appeared to be available only if the counseling would be provided in her home, which indeed reflects a lack of commitment on her part, as noted by the trial court. In addition, visitations between mother and child became sporadic and then nonexistent because mother was unable to improve the antagonistic relationship between them.

{¶ 35} More importantly, one of the half-brothers charged with raping S.H. continued to reside in the home. Although the rape cases have not been adjudicated, mother did not know how she would accommodate both S.H. and her son should S.H. return to the home.

{¶ 36} Based on our review, therefore, there is clear and convincing evidence on the record warranting the findings made by the trial court that S.H. cannot be placed with mother within a reasonable time or should not be placed with her. The first prong of the permanent-custody analysis is satisfied.

**The Trial Court's Findings Under the Second Prong (Best Interest of the Child) are Supported by Clear and Convincing Evidence**

{¶ 37} Under the two-prong analysis, once the court determines that one of the four factors listed in R.C. 2151.414(B)(1) is present, the court proceeds to an analysis of the child's best interest.   In determining the best interest of the child, R.C. 2151.414(D)(1) mandates that the juvenile court consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.[1]

{¶ 38} When analyzing the best interest of the child, "[t]here is not one element that is given greater weight than the others pursuant to the statute." *In re*

---

[1] These factors include: whether the parent has been convicted of certain crimes, has placed the child a substantial risk due to the parent's drug use, has withheld medical treatment for the child, has abandoned the child, or is incarcerated.  R.C. 2151.414(E)(7)-(11).

*Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Furthermore, only one of these enumerated factors needs to be resolved in favor of the award of permanent custody. *In re S.C.*, 8th Dist. Cuyahoga No. 102350, 2015-Ohio-2410, ¶ 30.

{¶ 39} As to the second part of the permanent-custody analysis, the trial court here noted that it has considered the statutory factors enumerated in R.C. 2151.414(D)(1) and found it to be in the best interest of S.H. for permanent custody to be granted to CCDCFS. The trial court specifically found that mother and S.H. have an ongoing parent–teen conflict that is so severe that it is not in the best interest of the child to reside in mother's home and that one of the child's half-brothers, who was charged with rape against S.H., still resided in mother's home.

{¶ 40} The record reflects clear and convincing evidence supporting the trial court's determination that permanent custody is in S.H.'s best interest. Regarding her interaction and interrelationship with her family (R.C. 2151.414(D)(1)(a)), the conflict between S.H. and her mother was so severe that even visitation or family counseling cannot be arranged. As to her relationship with the siblings, one sister was charged with domestic violence from an altercation with S.H., and two half-brothers were charged with sexually assaulting her. This factor alone weighs heavily in favor of permanent custody.

{¶ 41} Regarding S.H.'s wishes (R.C. 2151.414(D)(1)(b)), she was steadfast about not having her mother having any decision-making authority about her life due to their highly conflicted relationship. In addition, her unwillingness to return

to the home is understandable given mother's inability to protect her from her siblings: mother was present during the domestic violence incident involving S.H. and her sister, yet did not intervene; and mother did not have a plan to accommodate both her and her half-brother charged with raping her should she return to the home.

{¶ 42} As to the child's custodial history (R.C. 2151.414(D)(1)(c) and whether a legally secure placement can be achieved without a grant of permanent custody (R.C. 2151.414(D)(1)(d)), it is undisputed S.H. has been in the agency's custody for over two years. The relationship between mother and child became so contentious and strained that S.H. rejected PPLA, leaving permanent custody the only option.

{¶ 43} Therefore, our review of the record reflects clear and convincing evidence in support of the trial court's finding that permanent custody is in the best interest of the child. We recognize the paramount right of parents to raise their children, *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990); however, the parents' rights are not absolute. *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, at ¶ 40. "The constitutional right to raise one's children does not include a right to abuse, exploit, or neglect them, nor is there a right to permit others to do so." *Id.*

{¶ 44} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MICHELLE J. SHEEHAN, JUDGE

ANITA LASTER MAYS, P.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR