[Cite as *In re T.B.*, 2025-Ohio-2075.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE T.B.                                      :
                                                :          No. 114749
A Minor Child                                   :
                                                :
[Appeal by M.B., Mother]                        :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 29, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD22909114

---

### *Appearances:*

Scott J. Friedman, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee* CCDCFS.

DEENA R. CALABRESE, J.:

{¶ 1} Appellant M.B. ("mother") appeals the December 30, 2024 judgment of

the Cuyahoga County Court of Common Pleas, Juvenile Division ("juvenile court"),

which granted permanent custody of her child T.B. ("the child"), to the appellee

Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the

agency") pursuant to R.C. 2151.353(A)(4), thereby terminating mother's parental

rights. After reviewing the facts of the case and pertinent law, we affirm the juvenile court's judgment.

## I. Procedural History and Factual Background

{¶ 2} On September 9, 2022, the agency filed a complaint alleging that T.B., then four years old, was dependent and seeking a dispositional order of protective supervision to the agency. By orders dated September 16, 2022, and September 22, 2022, T.B. was removed from mother's care and committed to the emergency custody of the agency. Mother appeared with counsel on November 26, 2022, and admitted to the allegations as amended the same day, including (a) that she "needs to maintain safe and stable housing for the child"; (b) that she "has other children who were previously adjudicated in part due to mother's substance abuse issues"; (c) that T.B. "was also previously adjudicated Neglected and Dependent, in part due to Mother's substance abuse issues"; and (d) that mother "needs to complete a substance abuse assessment and follow through with any treatment recommendations." Mother agreed to the amended disposition of temporary custody. By journal entry dated December 4, 2022, T.B. was adjudicated to be dependent and was committed to the agency's temporary custody.

{¶ 3} By journal entry dated September 6, 2023, the order of temporary custody was extended. Just over four months later, on January 19, 2024, the agency filed a motion to modify temporary custody to permanent custody. On November 26, 2024, mother filed a motion requesting that T.B. be returned to her custody. The case went to trial on December 3, 2024. A court magistrate took

testimony from CCDCFS Child Protection Specialist Gohnnie Jackson, from Northern Ohio Recovery Association ("NORA") Life Skills Coach and Case Manager LaShawn Conner, from mother, from NORA Chemical Dependency Counselor David Pryor, and from T.B.'s guardian ad litem, Richard Summers. Multiple exhibits were admitted into evidence. We have reviewed the transcript, the exhibits, and the entire record below.

{¶ 4} Trial testimony, along with exhibits and the underlying record, indicate that one of mother's older children, D.G., was removed from her care and ultimately committed to the agency's permanent custody because of mother's issues with substance abuse, lack of stable housing, and medical neglect. D.G. was ten years old when the juvenile court entered the permanent custody order on May 23, 2023. Another child, M.G., who was sixteen years old at the time of trial, was committed to agency custody between 2018 and 2020 because of similar issues, including mother's substance abuse and lack of housing. That child was returned to mother's custody under protective supervision in December 2020. The agency terminated protective supervision in May 2021, and closed its file. Jackson testified that M.G. "stayed with a relative after that and he's been residing with a relative since then." (Tr. 12.)

{¶ 5} T.B. himself was previously in agency custody from December 2018, when he was just one year of age, through December 2020. Protective supervision was terminated in May 2021, and the case was closed in June 2021.

**{¶ 6}** Mother's care of T.B. came under scrutiny again in March 2022. At that time, his sibling D.G. "came into the emergency custody of the Agency due to concerns of medical neglect." (Tr. 13.) Mother was homeless with a pending DUI case and arrest warrant. At that time, however, the agency did not remove T.B. from mother's care. Jackson testified that while mother was homeless, she was living in a boarding house and there were no "immediate safety concerns." (Tr. 13.) The agency offered support services to mother, but she "was not able to maintain housing" and "was unable to maintain employment." (Tr. 13.) Mother also had concerns about T.B.'s behavioral issues. She "ultimately . . . asked for [T.B.] to come into agency custody." (Tr. 14.) Efforts to work with T.B.'s father were unsuccessful, and the agency filed its complaint and request for emergency custody in September 2022. The agency developed a case plan with a permanency plan of reunification, along with service objectives designed to address mother's substance abuse, housing issues, and T.B.'s basic needs.

**{¶ 7}** Jackson testified to mother's "extensive history of substance use and relapse," as well as mother's limited insight into her substance-abuse problems. (Tr. 16 and 20.) In June 2022, mother had been referred for a drug assessment with Moore Counseling, which recommended intensive outpatient treatment. While mother admitted to continuing drug use, she "didn't feel that she wanted to engage in services at the time" because "[h]er birthday was coming up, the holidays." (Tr. 16.) She said that once those occasions had passed, she would engage in substance-abuse services. In testimony underscoring not only mother's tendency to

minimize the severity of her substance abuse but also her conditional willingness to engage in professional treatment only as a means to achieve reunification, Jackson explained:

> You know, mother oftentimes stated that she did not feel that she had an issue with substance use, so she just kind of minimized it and, you know, stated that, you know, she can get clean on her own, but she would, you know, engage in services if she needed to so she can be reunified with her child.

(Tr. 20.)

{¶ 8} Mother sought substance-abuse services in November 2022. The agency referred her to New Visions for a drug assessment, but mother failed to follow through with the referral.

{¶ 9} In December 2022, however, mother completed a drug assessment at Community Assessment & Treatment Services ("CATS"). She completed an intensive outpatient treatment program in May 2023. After that, however, she failed to consistently submit to random drug screens. In September 2023, the juvenile court finally ordered her to submit a hair sample for testing purposes. The sample tested positive for both marijuana and cocaine.

{¶ 10} This led to another assessment referral by Jackson, again to New Visions. Mother once again did not follow through on that referral. Instead, she "contacted the Hitchcock center on her own and . . . was supposed to go into inpatient" in February 2024. (Tr. 18.) She had recently obtained employment and housing, however, so she rejected inpatient services. Instead, she contacted NORA

in March 2024.  NORA recommended an intensive outpatient program, and mother

began participating.  Jackson testified:

> She was testing positive for marijuana for a while.  Her levels [were not] going down.  They didn't start consistently going down until May of 2024, and then mother was supposed to be done with the program sometime in October or November of this year, but I have not been able to follow through with the assessor or her counselor.
>
> I've sent emails, I've made phone calls, but I haven't been able to verify that mother successfully completed the programs.
>
> My last correspondence with him was from July where mom was compliant.  I did speak to mom at a visit.  She stated that she's been compliant.
>
> She did submit a urine screen for the Agency in September and it was negative for drugs and alcohol.
>
> So from my understanding mother has been compliant with substance use at this time or drug treatment at this time.

(Tr. 19.)  Mother acknowledged in her testimony that she did not stop using drugs

"until the end of April" 2024.  (Tr. 62-63.)  Even then, she continued to test positive

until May 2024.

{¶ 11} By the time of trial, therefore, mother had been sober for

approximately six to seven months.  She admitted at trial that she had previously

relapsed, including after the May 2023 completion of the CATS intensive outpatient

program — a relapse period from June 2023 until March 2024.

{¶ 12} In 2022, when the agency resumed involvement with mother, she was

homeless.  The agency referred her to the Community Collaborative for assistance.

Mother eventually obtained both employment and housing, but her stable living

arrangements lasted only from June 2023 to July 2024.  Mother told Jackson she

left the residence because of "safety concerns," specifically a history of shootings, though she indicated she "never told nobody" about the shootings and did not tell anyone she was moving out because she did not feel safe. (Tr. 15 and 66-69.) Jackson testified that at some point mother did express her safety concerns and that mother rejected the recommendation to stay in order to establish a history of stable housing. (Tr. 15.)

{¶ 13} According to Jackson, mother told her that after moving out she had one housing prospect that fell through and thereafter has "been from place-to-place . . . and then homeless since then." (Tr. 15.) While mother argues in her brief that time spent living with her uncle should count as stable housing, her testimony painted a different picture. Mother testified her uncle's place was her "mailing address." (Tr. 54.) After moving out, she "put [her] stuff in storage" and began going "back and forth" between her uncle's place and the home of "a guy friend," where she lived "off and on." (Tr. 69.) She testified that "some nights I be at my uncle's, some I be at [the friend's] house" because the friend takes her to work. (Tr. 69-70.)

{¶ 14} Mother testified that she began work as a home health aide on June 23, 2024, that she worked every day, and that she was paid $1,600 every two weeks. Despite more than five months of income, however, at the time of trial mother still had not established stable housing. She nevertheless sought to assure the court that her rental of a spacious home was imminent. Mother testified that she would be moving into a new dwelling "this Friday," right after she was paid.

(Tr. 58.). She stated she paid a $900 security deposit but had not yet signed a lease. (Tr. 58.)

{¶ 15} Jackson confirmed that mother had identified housing and paid a deposit, but had not yet signed a lease. In addition, Jackson had not been able to visit the dwelling to confirm it was safe and otherwise appropriate. Furthermore, mother admitted that the new dwelling had no appliances and that she did not have any appliances in storage. As with the lease signing and move-in, however, she assured the court that she "can buy [appliances] Friday" when she gets paid. (Tr. 56.) When asked why she had not yet signed a lease, mother testified it was "because he [sic] don't have the rent money." (Tr. 73.)

{¶ 16} Testimony further established that T.B.'s father had not visited him since the September 2022 removal and that the father had not engaged in any case-plan services offered by the agency.[1] The agency had not been successful in identifying an appropriate relative for placement. Mother had been visiting with T.B. at a public library for two hours each week. Jackson testified that the child demonstrated a bond with mother, but that there had been no overnight visits or extended visits. T.B., who by the time of trial had been in agency custody for close to two and a half years, had been residing in a foster home since removal. Jackson testified that mother told her that if reunification could not be achieved, she preferred he stay with the foster caregivers.

---

[1] Father has not appealed the juvenile court's decision terminating his parental rights.

{¶ 17} Jackson further testified regarding the agency's reasons for seeking permanent custody. She emphasized that while mother had engaged in some services offered by the agency, there were continuing concerns regarding her ongoing lack of stable housing, especially considering her history of homelessness. The agency was particularly concerned that mother's recent decision to move out of stable housing and opt for homelessness reflected poorly on her judgment and decision-making abilities. Jackson stated that mother also had not maintained consistent employment. She further emphasized mother's history of drug abuse and relapse, noting a pattern of apparently promising treatment followed by a return to drug use. Jackson testified: "[I]t just appears to be a cycle that's going on and [T.B.] is in need of stability and consistency. He has been in the Agency custody for a total of 50 months. He is in need of permanency at this time." (Tr. 26.)

{¶ 18} During her case-in-chief, mother first elicited testimony from LaShawn Conner, a NORA life skills coordinator coach and case manager. Conner testified that mother had completed training for an STNA program and had been employed full time since the spring or summer of 2024. He had attempted to assist her with housing, but while they had "something in the works" with respect to temporary housing, "that didn't follow through for some reason." (Tr. 46.) He and mother did not discuss her reasons for leaving her previous stable housing, and in fact he was not aware that she had left that apartment. (Tr. 48 and 52.) He testified that while mother completed the NORA intensive outpatient program for substance abuse, she had not yet completed the aftercare program. (Tr. 49 and 52.)

**{¶ 19}** NORA Chemical Dependency Counselor David Pryor testified that he had been working with mother consistently since she began treatment with NORA and that while there had been "some ups and downs," mother had "done well" and had "been focused and doing what is required to maintain the services that [NORA] provide[s] successfully." (Tr. 81.) He noted, however, that "[i]n the beginning it was tedious because she didn't grasp or even understand that she had a problem." (Tr. 82.)[2] Pryor testified that the intensive program usually takes only 90 days, "but with [mother] it was 120 days." (Tr. 82.) He stated that "that's how long it took her to get to the point of abstinence and being also in the process of identifying and learning the things she needed to learn to maintain the progress that she had achieved." (Tr. 82-83.) Pryor testified that mother had been doing well in the aftercare component of the program. He even indicated that mother was "appropriate to be discharged right now," but that he "wanted to make sure that she got through this situation successfully." (Tr. 85.)

**{¶ 20}** The child's GAL, Richard Summers, addressed the court after closing arguments. He praised the efforts of agency caseworker Jackson, but indicated that mother's "life is a roller coaster and at some point there needs to be permanency in this child's life." (Tr. 97.) Summers's stated: "[T]hat leads me, I don't think that with any other recommendation that I could say in good conscience, other than recommending permanent custody be granted." (Tr. 97.) He followed up by stating,

---

[2] We note that at this point, mother's parental rights had already been permanently terminated with respect to one child, and that another child, also subject to agency proceedings, had not lived with her for years.

under oath, that "[e]ven if mother had signed a lease, [his] recommendation would have been permanent" custody to the agency. (Tr. 98.)

{¶ 21} The magistrate stated on the record that while mother had been offered extensive services, "as we sit here today more than two years into the case [mother] has not shown a significant or long-term benefit from those services." (Tr. 99.) The magistrate further stated:

> The Court cannot do anything other than based on the testimony and evidence find, as well as the recommendation of the Guardian ad Litem, and considering all the relevant factors, including but not limited to each of the factors listed in Ohio Revised Code 2151.414, an order of permanent custody of the child is in this child's best interest, and that will be the order of the Court.

(Tr. 99-100.) Consistent with these findings, the magistrate issued a decision on December 4, 2024. Mother filed objections on December 16, 2024, to which the agency responded on December 19, 2024. On December 30, 2024, the trial court entered an order overruling mother's objections, terminating all parental rights, and committing the child to the permanent custody of the agency. This timely appeal followed.

## II. Analysis

{¶ 22} Mother presents a single assignment of error for our review:

> The juvenile court erred in terminating Mother's parental rights, in violation of her rights under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

{¶ 23} While the assignment of error frames the case as one with constitutional implications, mother principally argues that the juvenile court's

decision to terminate her parental rights was unsupported by sufficient evidence and was not against the manifest weight of the evidence.[3]

## A. Sufficiency

{¶ 24} Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to the agency that moved for permanent custody if the court determines, "by clear and convincing evidence, that it is in the best interest of the child" to do so and that one of five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies. *In re Z.C.*, 2023-Ohio-4703, ¶ 7. The Ohio Supreme Court has stated:

> "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."

*Id.* at ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. *See also In re A.M.*, 2025-Ohio-752, ¶ 14 (8th Dist.).

{¶ 25} Under R.C. 2151.414(B)(1), the juvenile court may grant permanent custody if there is a finding it is in the child's best interests and that any of these five conditions apply:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or

---

[3] Mother's assignment of error cites the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution, but her brief contains no other references to either constitutional provision. While mother's brief cites a number of cases for the general (and accurate) proposition that parents have a fundamental liberty interest in the care and custody of their children, none of her arguments focus on concepts such as substantive or procedural due process, equal protection, or any alleged infringement of her constitutional rights.

private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a)-(e).

{¶ 26} When considering a sufficiency challenge to the juvenile court's decision in which "'the proof required must be clear and convincing,'" we "'examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *In re Z.C.* at ¶ 8, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990). *See also Ford v. Osborne*, 45 Ohio St. 1 (1887), paragraph two of the syllabus. A reviewing court should affirm the trial court when the

evidence is legally sufficient to support the judgment as a matter of law. *In re Z.C.* at ¶ 13; *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 3.

{¶ 27} In satisfaction of R.C. 2151.414(B)(1)(d), the juvenile court found that T.B. had been in agency custody "for twelve or more months of a consecutive twenty-two-month period." The record supports this conclusion. It reflects that T.B. was removed from mother's care in September 2022 and has remained in the care of the agency since removal. This fulfills the first prong of the permanent custody statutory framework.

{¶ 28} Having found that R.C. 2151.414(B)(1)(d) applies, the juvenile court could have immediately proceeded to best-interest findings. Instead, it also found "that the child cannot be placed with her mother or father within a reasonable time or should not be placed with the child's mother or father." It made explicit findings pursuant to R.C. 2151.414(E). "A juvenile court is only required to find that *one* of [the R.C. 2151.414(E)] factors is met in order to properly find that a child cannot or should not be placed with a parent." (Emphasis added.) *In re Y.F.*, 2024-Ohio-5605, ¶ 43 (8th Dist.), citing *In re Ca.T.*, 2020-Ohio-579, ¶ 27 (8th Dist.).

{¶ 29} Here, in accordance with R.C. 2151.414(E), the juvenile court found by clear and convincing evidence that "the child cannot be placed with one of the child's parents within a reasonable time and should not be placed with either parent" upon determining that there is evidence that one or more of the statutory factors exist, including R.C. 2151.414(E)(2), (11), and (16).

{¶ 30} In accordance with R.C. 2151.414(E)(2), the juvenile court found that mother "has chronic chemical dependency issues[.]" The trial record is replete with competent, credible evidence that mother has long-term substance-abuse issues with marijuana, cocaine, and alcohol, including periods of sobriety followed by relapse. Testimony indicated that these problems were documented by the agency as far back as 2018, and then again when the case was reopened in 2022. Mother also minimized her substance-abuse issues, avoiding one outpatient treatment program because it was too close to her birthday and the holidays and leaving a NORA Chemical Dependency Counselor Pryor with the impression that she "didn't grasp or even understand that she had a problem." (Tr. 82.) When mother did complete an outpatient program in May 2023, she failed to consistently submit to random testing. It was only when the court forced her hand in September 2023 that she submitted a hair sample for testing, resulting in a positive for both marijuana and cocaine. She then failed to follow up on referrals, waiting until March 2024 to begin another treatment program. Even then, she continued to test positive until May 2024, even admitting that she did not discontinue smoking marijuana "until the end of April." (Tr. 62-63.) Pryor was optimistic but noted that mother took longer than usual to complete the intensive program and acknowledged that "[t]he changes that she made can be temporary." (Tr. 84.) Mother has a demonstrated history of relapse.

{¶ 31} In admitting to the allegations in the amended complaint, mother conceded that she had previously had children (including T.B.) removed from her

care because of her substance-abuse issues and that she needed to follow through with substance-abuse-treatment recommendations, supporting a conclusion that drug use interfered with her parenting. Furthermore, the record supports the conclusion that even if mother consumed marijuana legally, "substance abuse services were included in mother's case plan," which she failed to fully complete, and she had also "tested positive for cocaine." *In re E.C.*, 2020-Ohio-3807, ¶ 46 (8th Dist.). While mother had made progress, the record supports the trial court's finding of chronic chemical dependency that was unresolved at the time of trial, with mother unable to provide an adequate permanent home for T.B., despite mother's arguments that she has now beaten her substance-abuse issues. *See, e.g., In re M.H.*, 2002-Ohio-2968, ¶ 34 (8th Dist.) ("[E]ven though mother had been drug-free for the six months preceding trial, her erratic history of drug-use and her unsuccessful attempts at so many other drug treatment programs does not leave this court convinced of mother's ability to remedy her drug dependency, on a long-term basis.").

{¶ 32} Pursuant to R.C. 2151.414(E)(11), the juvenile court found that mother "has had parental rights terminated involuntarily with respect to a sibling of the child," and also that she "has not benefited from services as shown by her chronic homelessness and substance abuse." Testimony and exhibits unequivocally supported the juvenile court's conclusion that mother's parental rights had been terminated with respect to T.B.'s sibling, D.G. R.C. 2151.414(E)(11) states that in these circumstances, the parent must "provide clear and convincing evidence to

prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child." *Id.* The burden therefore shifts to mother in these circumstances. *See In re J.H.*, 2017-Ohio-940, ¶ 22 (8th Dist.) ("[W]here this factor is established, the burden is then on the parent to provide clear and convincing evidence to prove that he or she can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.").

{¶ 33} The juvenile court record reflects that mother did not satisfy this burden. During the nearly two and a half years after T.B's most recent removal, mother's living situation consisted of homelessness, the abandonment of one long-term apartment, more homelessness, and still no suitable living arrangements by the time of trial. She admitted at trial that she used her uncle's place as a "mailing address" and that she actually went back and forth between his place and the home of a friend. She had not established stable, appropriate housing. At trial, she assured the court that she could resolve her housing issue at the end of the week, once she received her next paycheck, notwithstanding her simultaneous claim that she had been working full time for several months. Even then, the proposed new home had no appliances, and mother did not have any appliances in storage. Again, she offered just a pledge that she would obtain appliances after payday. We reject mother's suggestion that homelessness was no longer an issue by the time of trial.

{¶ 34} R.C. 2151.414(E)(16) specifies that the juvenile court may consider any other factors it deems relevant. *See, e.g., In re S.H.*, 2019-Ohio-3575, ¶ 29 (8th

Dist.). We have already concluded that the juvenile court's orders reference mother's chronic homelessness, which is amply supported by the record.

{¶ 35} Our independent review confirms that the juvenile court's determination that one or more of the R.C. 2151.414(E) factors exist is supported by the record. Because the juvenile court found that multiple R.C. 2151.414(E) factors applied, it was required to enter a finding that T.B. could not or should not be returned to mother. The statute states that "[i]f the court determines, by clear and convincing evidence . . . that one or more of the [the enumerated] factors exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent[.]" *Id. See also In re Glenn*, 139 Ohio App.3d 105, 113 (8th Dist. 2000).

{¶ 36} The juvenile court also found "by clear and convincing evidence that a grant of permanent custody is in the best interests of the child[.]" It wrote:

> Upon considering the interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster parents; the wishes of the child; the custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period; the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and, the report of the Guardian ad Litem, the Court finds by clear and convincing evidence that a grant of permanent custody is in the best interests of the child and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

{¶ 37} The juvenile court's best-interest analysis is governed by R.C. 2151.414(D). More specifically, the juvenile court is required to make findings under

one of two alternative provisions as set forth at subparagraphs (D)(1) and (D)(2) of

the statute. The interplay has been explained as follows:

> As we understand division (D)(2), if all of the facts enumerated therein apply, then an award of permanent custody is in the child's best interest, and the trial court need not perform the weighing specified in division (D)(1). But if it is not the case that all of the facts enumerated in division (D)(2) exist; that is, if any one of the facts enumerated in division (D)(2) does not exist, then the trial court must proceed to the weighing of factors set forth in division (D)(1) to determine the child's best interest.

*In re K.H.*, 2010-Ohio-1609, ¶ 54 (2d Dist.). *See also In re P.J.*, 2021-Ohio-1821,

¶ 26 (8th Dist.) (Where "all the factors under R.C. 2151.414(D)(2) apply, permanent

custody was necessarily in the best interest of the child and the juvenile court was

required to grant permanent custody to CCDCFS.").

{¶ 38} Counsel for the agency argued at trial for findings pursuant to R.C.

2151.414(D)(2)(a)-(d). That code section provides:

> If all of the following apply, permanent custody is in the best interest of the child, and the court shall commit the child to the permanent custody of a public children services agency or private child placing agency:
>
> (a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.
>
> (b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.
>
> (c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

*Id.*

{¶ 39} The juvenile court found "by clear and convincing evidence" that "the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent." As discussed above, this conclusion flows from the juvenile court's consideration of the R.C. 2151.414(E) factors. It is supported by the record and satisfies R.C. 2151.414(D)(2)(a).

{¶ 40} The trial court also found that T.B. had "been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period." There was no dispute with respect to this conclusion, and it is supported by the record. Furthermore, based on the custody timeline, T.B. no longer qualified for continuing temporary custody pursuant to R.C. 2151.415(D)(4), which provides in pertinent part:

[T]he court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been previously ordered pursuant to division (D) of this section.

*Id.*

{¶ 41} The requirements of R.C. 2151.414(D)(2)(c) are met if the child "does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code." *Id.* R.C. 2151.353(A)(5)

provides that upon an adjudication of abuse, neglect, or dependency, a juvenile court may make any of several dispositions, including:

> Place the child in a planned permanent living arrangement with a public children services agency or private child placing agency, if a public children services agency or private child placing agency requests the court to place the child in a planned permanent living arrangement and if the court finds, by clear and convincing evidence, that a planned permanent living arrangement is in the best interest of the child, that the child is sixteen years of age or older, and that one of the following exists:
>
> (a) The child, because of physical, mental, or psychological problems or needs, is unable to function in a family-like setting and must remain in residential or institutional care now and for the foreseeable future beyond the date of the dispositional hearing held pursuant to section 2151.35 of the Revised Code.
>
> (b) The parents of the child have significant physical, mental, or psychological problems and are unable to care for the child because of those problems, adoption is not in the best interest of the child, as determined in accordance with division (D)(1) of section 2151.414 of the Revised Code, and the child retains a significant and positive relationship with a parent or relative.
>
> (c) The child has been counseled on the permanent placement options available to the child, and is unwilling to accept or unable to adapt to a permanent placement.

*Id.* Here, T.B. was seven years of age at the time of trial. "To qualify for a planned permanent-living arrangement under R.C. 2151.353, the child must, among other things, be 'sixteen years of age or older[.]'" *In re A.F.*, 2023-Ohio-4423, ¶ 51 (8th Dist.), quoting R.C. 2151.353(A)(5). T.B. is therefore "too young to be placed into a planned permanent living arrangement." *In re D.P.*, 2020-Ohio-6663, ¶ 25 (12th Dist.). Moreover, the agency had not requested a planned permanent living

arrangement, and the record does not suggest that any of the other R.C. 2151.353(A)(5)(a)-(c) factors would apply.

{¶ 42} Lastly, the record reflects that prior to the dispositional hearing, no relative or other interested person filed, or has been identified in, a motion for legal custody. This satisfies R.C. 2151.414(D)(2)(d).

{¶ 43} We are mindful that the trial court did not include specific R.C. 2151.414(D)(2) findings in its final entry. The Ohio Supreme Court, however, has held that "a reviewing court is not authorized to reverse a correct trial judgment merely because erroneous reasons were assigned as a basis therefor." *Myers v. Garson*, 66 Ohio St.3d 610, 614 (1993). Competent, credible evidence in the record supports the conclusion that all R.C. 2151.414(D)(2) factors were satisfied, thereby establishing that permanent custody to the agency is in T.B.'s best interests.

{¶ 44} Moreover, even if we set aside R.C. 2151.414(D)(2), the juvenile court expressly listed and considered all the relevant factors under R.C. 2151.414(D)(1)(a) through (e). Those factors are:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a

consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶ 45} When analyzing the best interest of the child under R.C. 2151.414(D)(1), "[t]here is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Furthermore, "[t]he Ohio Supreme Court has held that 'R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires.'" *In re M.B.*, 2024-Ohio-6028, ¶ 30 (8th Dist.), quoting *In re A.M.*, 2020-Ohio-5102, ¶ 31. *See also In re A.M.*, 2025-Ohio-752, at ¶ 21 (8th Dist.).[4]

{¶ 46} The juvenile court's decision indicates it considered the required statutory factors with respect to the best interests of T.B. Our independent review confirms that the juvenile court's best-interest determination is supported by the record.

---

[4] Mother cites *In re B.D.*, 2009-Ohio-2299 (11th Dist.), for the proposition that the trial court must explicitly address each of the statutory best-interest factors in its decision. This court, however, has discussed and rejected *In re B.D.* in this respect. *See In re P.A.R.*, 2019-Ohio-1446, ¶ 33-38 (8th Dist.). More importantly, *In re B.D.* appears to conflict with the Ohio Supreme Court's later opinion in *In re A.M.*, 2020-Ohio-5102, at ¶ 31.

{¶ 47} R.C. 2151.414(D)(1)(a) relates to interactions and relationships. Trial testimony indicated that mother had weekly visits with the child at a public library and that the visits went well, but they had not progressed to extended visits or overnight stays. A good relationship is insufficient, however, because "'[o]verall, we are concerned with the best interest of the child, not the mere existence of a relationship.'" *In re K.M.*, 2011-Ohio-349, ¶ 23 (8th Dist.), quoting *In re R.N.*, 2004-Ohio-2560, ¶ 37 (8th Dist.). Indeed, a child's relationship with his or her "biological family" can be "outweighed by [the child's] right to a stable and permanent home." (Cleaned up.) *In re K.M.* at ¶ 23.

{¶ 48} R.C. 2151.414(D)(1)(b) deals with the child's wishes. This court has found that children of T.B.'s age "are too young to express an opinion on their wishes." *In re Harlston*, 2003-Ohio-282, ¶ 44 (8th Dist.). The GAL, however, recommended permanent custody to the agency. This court has previously held that in relation to this factor, consideration of the GAL's recommendation is appropriate. *In re R.A.*, 2021-Ohio-4126, ¶ 52 (8th Dist.).

{¶ 49} The factor addressed in R.C. 2151.414(D)(1)(c) bears little additional discussion. It is undisputed that T.B. was removed from mother's care in September 2022 and has been in the care of the agency since that time. Accordingly, this factor favored permanent custody.

{¶ 50} R.C. 2151.414(D)(1)(d) concerns the child's need for a legally secure placement and whether such a placement can be achieved without a grant of permanent custody. As discussed above, the juvenile court's conclusion that T.B.

could not be placed with a parent within a reasonable time or should not be placed with either parent was supported by findings consistent with R.C. 2151.414(E), any of which mandate that legal conclusion. Furthermore, "a trial court's finding that it cannot or should not place a child with a parent precludes the court from considering returning the child to Mother's custody." *In re T.S.*, 2024-Ohio-827, ¶ 61 (8th Dist.). This factor likewise favors permanent custody to the agency.

{¶ 51} Finally, R.C. 2151.414(D)(1)(e), which addresses "[w]hether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child," applies to this matter because of division (E)(11), which relates to the prior termination of parental rights concerning a sibling. The agency's exhibits included certified copies of juvenile court records relating to the termination of mother's parental rights with respect to D.G., who is T.B.'s sibling.[5]

{¶ 52} Based upon its review of the statutory factors, the juvenile court found "by clear and convincing evidence that a grant of permanent custody is in the best interests of the child." Our independent review confirms that the juvenile court's best-interest determination is supported by the record.

{¶ 53} Upon review, we find that the juvenile court, in its written findings, engaged in a proper analysis and made the requisite statutory determinations

---

[5] The agency notes the trial court's finding that T.B. has been "abandoned by his father" and suggests this satisfies the abandonment factor specified in R.C. 2151.414(E)(10). The trial court, however, specified that T.B. had been "abandoned by his father only." Father did not participate in proceedings below and has not appealed the juvenile court's judgment awarding permanent custody to the agency. The juvenile court did not find that mother had abandoned T.B., and the record does not support an R.C. 2151.414(E)(10) finding of abandonment by mother.

pursuant to R.C. 2151.353(A)(4) and in accordance with R.C. 2151.414(E) and 2151.414(D)(1). After careful review of the entire record, we find the evidence was legally sufficient to support the juvenile court's decision as a matter of law.

## B. Manifest Weight

{¶ 54} We recently reiterated that "[a] juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence when the record contains competent, credible evidence by which it could have found that the essential statutory elements for an award of permanent custody have been established." *In re A.M.*, 2024-Ohio-1168, ¶ 15 (8th Dist.), citing *In re B.M.*, 2020-Ohio-4756, ¶ 11 (8th Dist.). When reviewing a manifest-weight challenge, we "must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re Z.C.*, 2023-Ohio-4703, at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20; *see also In re J.F.*, 2024-Ohio-3311, ¶ 14 (8th Dist.). "We will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency unless the judgment is not supported by clear and convincing evidence." *In re S.H.*, 2019-Ohio-3575, at ¶ 25 (8th Dist.), citing *In re N.B.*, 2015-Ohio-314, ¶ 48 (8th Dist.); *see also In re M.J.*, 2013-Ohio-5440, ¶ 24 (8th Dist.).

{¶ 55} Following our thorough review of the record as discussed above, the greater weight of the evidence established that permanent custody was supported

by the statutory factors, including factors for determining the best interest of T.B. We cannot say that the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the grant of permanent custody should be reversed. By the time of trial, mother had not satisfied the objectives of her case plan. She lacked housing. She had demonstrated sobriety, but even her own key witness on this issue was concerned about relapse after discharge from the NORA program. The juvenile court wrote that mother "has not benefited from services as shown by her chronic homelessness and substance abuse."

{¶ 56} That finding is supported by our independent review of the record. Moreover, even if mother had completed a case plan, such a plan is "a means to a goal, but not the goal itself." *In re C.C.*, 2010-Ohio-780, ¶ 25 (8th Dist.). Accordingly, "courts have held that the successful completion of case plan requirements does not preclude a grant of permanent custody to a social services agency." *Id.*, citing *In re J.L.*, 2004-Ohio-6024, ¶ 20 (8th Dist.), and *In re Mraz*, 2002-Ohio-7278 (12th Dist.). *See also In re M.T.*, 2024-Ohio-3111, ¶ 51 (8th Dist.) ("[E]ven substantial compliance with case plan services" is not dispositive because the ultimate issue is """whether the parent has substantially remedied the conditions that caused the child's removal."""), quoting *In re J.B.*, 2013-Ohio-1704, ¶ 90 (8th Dist.), quoting *In re McKenzie*, 1995 Ohio App. LEXIS 4618, *11 (9th Dist. Oct. 18, 1995).

{¶ 57} Just over 25 years ago, this court commended "the recent favorable strides taken by [a] Mother to complete the case plan," but noted that she had not

yet completed the plan. *In re Michelle*, 2000 Ohio App. LEXIS 1186, *25 (8th Dist. Mar. 23, 2000). The court upheld the termination of parental rights and wrote:

> As parents ourselves, we sympathize with another parent's natural desire to maintain the normal legal relationship with his or her offspring, however we recognize that desires and good intentions by a parent, no matter how forcefully advanced or honestly held, must be placed in perspective against reality and past history in order to weigh the best interests of the children in a future context.

*Id.* at *26.

{¶ 58} We do not find the juvenile court's decision to grant permanent custody of the children to the agency to be against the manifest weight of the evidence.

{¶ 59} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
DEENA R. CALABRESE, JUDGE

EILEEN T. GALLAGHER, P.J., and
MICHAEL JOHN RYAN, J., CONCUR